******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* EUCLIDES L.*
(AC 40032)

Alvord, Prescott and Eveleigh, Js.

*Syllabus*

Convicted of the crime of risk of injury to a child, the defendant appealed
to this court. The defendant's conviction stemmed from an incident in
which his four month old daughter sustained bruising to her face that
was caused when the defendant held her face while trying to suction
mucus from her nose. On appeal, he claimed that the trial court improp-
erly failed to instruct the jury that it should acquit him if it concluded
that his use of force in caring for his daughter was an accident. *Held*
that the trial court's charge to the jury was legally correct and adequately
instructed the jury on the issue of accident; although that court did not
provide the jury with a separate accident charge, a separate charge was
not required under the law, as a claim of accident is not a justification
for a crime and negates only the element of intent, and when a defendant
asserts a claim of accident, namely, that the state failed to prove the
intent element of the criminal offense, a separate jury instruction is not
required because the court's instruction on the intent required for the
commission of the crime is sufficient in such circumstances, and in the
present case, the trial court expressly mentioned accident in the context
of the general intent requirement when it stated that the state was
required to prove that the defendant intentionally, and not inadvertently
or accidentally, engaged in his actions.

Argued January 15—officially released April 9, 2019

*Procedural History*

Substitute information charging the defendant with
the crime of risk of injury to a child, brought to the
Superior Court in the judicial district of Tolland and
tried to the jury before *Graham, J.*; verdict and judg-
ment of guilty, from which the defendant appealed to
this court. *Affirmed.*

*Robert L. O'Brien*, assigned counsel, with whom, on
the brief, was *William A. Adsit*, assigned counsel, for
the appellant (defendant).

*Nancy L. Walker*, assistant state's attorney, with
whom, on the brief, were *Matthew C. Gedansky*, state's
attorney, and *Elizabeth C. Leaming*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Euclides L., appeals from the judgment of conviction, rendered after a jury trial, of one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[1] On appeal, the defendant claims that the trial court violated his constitutional rights by failing to instruct the jury that it should acquit the defendant if it concluded that his use of force in caring for his daughter, V, was an accident. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and J have one child together, V. From October, 2014, to January 9, 2015, the defendant, J and V lived together in an apartment in Vernon. During this time, the defendant and J were V's primary caregivers.

On January 9, 2015, V, who was four months old at the time, was fussy because she was suffering from a cold and had received vaccinations two days earlier. At approximately 9:30 p.m., the defendant and J took V upstairs to put her to bed. While the defendant prepared V for bed, J was downstairs, although she periodically came upstairs to check on the defendant and the child. At approximately 11:10 p.m., after V fell asleep, the defendant joined J downstairs.

After spending "about a minute [downstairs] . . . [the defendant] asked J if [he] should wake [V] up and feed her because she didn't eat before bed." After J agreed that they should try to feed V, the defendant "grabbed [V's] bottle and went upstairs and [woke] her up." When the defendant woke V, the child began to cry hysterically. Because V was congested and "mucous was coming out of her nose in bubbles," the defendant tried to suction mucous out of her nose using a plastic bulb syringe. V wiggled and resisted the defendant so the defendant "grabbed her face." This episode lasted approximately a minute to a minute and a half.

J, who was downstairs while the defendant attempted to suction V's nose, heard V crying and went upstairs to check on the defendant and the child. As J approached the room in which the defendant was tending to V, she heard a muffled cry. When J entered the room, she saw that there was blood around V's nose and that the child's skin was blue in color. J believed that V needed oxygen and feared that this was a side effect of the vaccinations V had received two days earlier.[2]

J and the defendant immediately drove V to Rockville General Hospital (hospital). They arrived at the hospital at approximately 11:30 p.m. While the defendant parked the car, J ran into the hospital carrying V in her arms. J told the hospital staff that V was turning blue and needed oxygen. V was crying when she arrived, but

stopped after being comforted by hospital staff.

Danielle Mailloux, a physician employed at the hospital, attended to V. Mailloux observed a red mark under the child's nose and a purple round mark that was approximately two centimeters in diameter on her left cheek. During the first two hours that V was at the hospital, this mark grew in size and two additional marks developed on the right side of the child's face. Mailloux believed that the marks on V's face were bruises.

Mailloux inquired as to V's medical history and concluded that the injuries could not be accounted for by any preexisting medical condition, including the vaccines V had received two days earlier. Mailloux asked V's parents how the child acquired the injuries, but neither the defendant nor J was able to provide Mailloux with an explanation. Because the unexplained bruising on V suggested abuse, Mailloux determined that she would need to file a report with the Department of Children and Families (department).

Mailloux recommended that V be transferred to Connecticut Children's Medical Center in Hartford for inpatient treatment. Mailloux informed the defendant and J that after V was transferred, the department was going to become involved. At this point, the defendant became upset and said he would not sign the paperwork to have V transferred to Connecticut Children's Medical Center.

Despite the defendant's protestations, on January 10, 2015, V was transferred to Connecticut Children's Medical Center. Once V arrived, the police interviewed the defendant and J separately. During the interviews, neither the defendant nor J was able to explain how V had sustained her injuries. On January 12, 2015, William Olsen, an employee of the department, interviewed the defendant and J. Both the defendant and J indicated that they did not hurt V but again failed to provide an explanation for the child's injuries.

Also on January 12, 2015, Nina Livingston, a physician and the director of the Suspected Child Abuse and Neglect team at Connecticut Children's Medical Center, evaluated V. Livingston noted that V had "facial bruising in a wraparound distribution [from] ear to ear. . . ." Specifically, V had bruises on her forehead, left eyelid, cheeks, temples, jawline, both ears, and above and below her left eye. Additionally, V had abrasions below her right nostril, right ear, and left temple, as well as subconjunctival hemorrhages in both eyes. Because the injuries could not be accounted for by alternative medical causes and V could not yet roll over, Livingston concluded that V's injuries had been caused by someone else. On the basis of Olsen's and Livingston's findings, the department invoked a 96 hour administrative hold on behalf of V.

On January 19, 2015, a week after the department

invoked the 96 hour hold, the defendant revealed to J that he had caused V's bruises by holding her face while trying to suction mucous from her nose. J encouraged the defendant to disclose this information to the police. The defendant agreed to speak with the police, and J drove him to the police station, where, in a recorded video statement, the defendant admitted that he was responsible for V's bruises.

The defendant also provided the police with a written statement in which he stated the following in regard to his attempts to suction V's nose: "I was almost taking my anger out on [V]. It was almost like we were having a conversation and she was not letting me do it and I was going to do it. I was holding her face hard to keep her head still, I would say it was a 10 on a scale from 1 to 10. She was fighting me and flailing her face back and forth. I was holding [her] harder than I should hold a baby. . . . I am devastated . . . that I had to put my daughter through this because I couldn't control myself. . . . It was just the frustration of what I was going through and I lost control."

In February, 2015, the defendant was arrested in relation to V's injuries. On June 28, 2016, the state charged the defendant with one count of risk of injury to a child in violation of § 53-21 (a) (1). The defendant entered a not guilty plea and elected to be tried by a jury.

On September 29, 2016, following a trial before a jury, the defendant was convicted of one court of risk of injury to a child in violation of § 53-52 (a) (1). The defendant then filed the present appeal in which he argues that the trial court violated his constitutional rights by failing to instruct the jury that his use of force in caring for V was an accident. The state argues that the defendant's claim fails because (1) he waived his appellate claim by abandoning the precise language of his request to charge on accident, (2) the trial court's instruction on general intent was legally correct and gave ample guidance to the jury on the issue of accident, and (3) any error in failing to instruct the jury more fully on accident was harmless. Even if we assume, without deciding, that the defendant did not waive his appellate claim by abandoning the precise language of his request to charge, we conclude that his claim fails on the merits because the court's charge was legally correct.[3]

The following facts are necessary for the resolution of this issue. On August 31, 2016, the defendant submitted the following request to charge: "For you to find the defendant guilty of risk of injury, you must find beyond a reasonable doubt that the defendant intentionally squeezed [V's] face too hard. If you find that the defendant accidentally used excessive force, i.e., he did not know that he was squeezing [V's] face too hard, then you must find him not guilty. The evidence to which this charge applies is the testimony of the defen-

dant and [J] that the defendant held [V's] head while suctioning her nose."

On September 2, 2016, the state argued, with respect to the defendant's proposed charge: "I would also take issue with the claim of accident, when this is a . . . general intent . . . crime and all the state must prove is that the defendant intended to do the act. . . . [In a risk of injury charge] the state need only prove [the defendant] intended to do the act, not inflict the injury . . . . [A]n accident defense isn't relevant to this kind of charge. The defendant isn't claiming he accidentally grabbed the child's face. He's claiming he accidentally inflicted the injury. . . . [T]here is no accident defense in this case because . . . by [the defendant's] own admissions . . . he purposely grabbed the child's face, but thereafter used excessive force and inflicted the injury." The defendant did not respond to the state's objection to his request to charge.

On September 28, 2016, the court provided counsel with a draft of the proposed charge. This version of the charge provided: "Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. I instruct you now as to general intent because it applies to the charge of risk of injury. General intent is the intent to engage in conduct. As to the charge of risk of injury, it is not necessary for the state to prove that the defendant specifically intended to endanger [V's] physical well-being. Rather, the state is required to prove that the defendant intentionally and not inadvertently or accidentally engaged in his actions which did constitute blatant physical abuse. In other words, the state must prove that the defendant's actions in forcefully covering her face with his hands were intentional, voluntary and knowing rather than unintentional, involuntary and unknowing."

In discussing the second draft of the charge with counsel, the court explained: "This [instruction] touches upon the issue of intent to engage in conduct as opposed to inadvertently or accidentally engaging in actions. This is the only part in the charge where some conjugation of the word accident is going to occur. I mention that . . . because of [the] prior request [of counsel for the defendant]. I also think it's consistent with *State* v. *Martin*, [189 Conn. 1, 454 A.2d 256, cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983)]." The court then asked if counsel had any problems with the instruction. The defendant did not reply to the court's inquiry. The court thereafter informed counsel that it would give charges on unanimity and parental justification and that accident was "subsumed under general intent." The following day, on September 29, 2016, the court suggested minor changes to the charge and asked whether counsel wanted to add anything before the jury was brought out for closing argument. Both counsel indicated that they had nothing

to add.

During closing argument, defense counsel stated: "This is a case about a father trying to help his daughter, not hurt her. She had a cold that he suctioned her nose with a bulb syringe to get the mucous out, caused the bruises, but he did that in order to treat her cold, to treat her stuffy nose and he held her head too hard, but he didn't do that on purpose. He did it accidentally. He is not the kind of father that would do that. He's calm. He's patient. He's gentle."

In response, the state argued: "The defendant wants you to consider the fact that this was an accident and you're not going to hear that as a defense, when the judge instructs you on the law. The judge is going to indicate to you that the state must prove that the defendant's actions in forcefully covering the face of a child with his hands were intentional, voluntary and knowing . . . rather than unintentional, involuntary and unknowing. So, the state must prove that the defendant intentionally and forcefully cover[ed] the child's face, but . . . need not prove the defendant desired the ultimate outcome or intended the ultimate outcome. So, he may not have meant to cause the bruising on the child, he may not have thought in advance that that is what's going to happen. That doesn't matter. That doesn't make [it] an accident that relieves him of his criminal responsibility for his actions."

Following closing argument, the court charged the jury with the following general intent instruction: "Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. I instruct you now as to general intent because it applies to the charge of risk of injury. General intent is the intent to engage in conduct. As to the charge of risk of injury, it is not necessary for the state to prove that the defendant specifically intended to endanger [V's] physical well-being. Rather, the state is required to prove that the defendant intentionally and not inadvertently or accidentally engaged in his actions. In other words, the state must prove that the defendant's actions in forcefully covering her face with his hand were intentional, voluntary, and knowing rather than unintentional, involuntary and unknowing."

The court further instructed the jury on the elements of the risk of injury to a child pursuant to § 53-21, stating: "The first element is that the defendant did an act that was likely to impair the health of the child. Please recall my earlier instruction on general intent. To be likely to impair the health of a minor, the statute requires that the defendant committed blatant physical abuse that endangered the child's physical well-being." Furthermore, the court instructed that "the state must prove beyond a reasonable doubt that . . . the defendant did an act of blatant physical abuse that endangered the child's physical well-being and was likely to

impair the health of the child . . . .”

The court also instructed the jury on the defense of justification, stating: “The evidence in this case raises the issue that the defendant, as a parent, was justified in the use of physical force upon [V] because he was promoting her welfare by suctioning her nose. After you have considered all of the evidence in this case, if you find that the state has proved each element of risk of injury, you must go on to consider whether or not the defendant was justified in his use of force. When, as in this case, evidence of justification was introduced at trial, the state must not only prove beyond a reasonable doubt all the elements of the crime charged but must also disprove beyond a reasonable doubt that the defendant was justified in his use of force.”

With these facts in mind, we set forth the relevant standard of review and legal principles that guide our analysis. “Our review of the defendant’s claim requires that we examine the [trial] court’s entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court’s failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper.” (Internal quotation marks omitted.) *State* v. *Boyd*, 176 Conn. App. 437, 449, 169 A.3d 842, cert. denied, 327 Conn. 972, 174 A.3d 192 (2017). A court, however, “is under no obligation to give a requested jury instruction that does not constitute an accurate statement of the law.” (Internal quotation marks omitted.) *State* v. *Harper*, 184 Conn. App. 24, 40, 194 A.3d 846, cert. denied, 330 Conn. 936, 195 A.3d 386 (2018).

Section 53-21 (a) provides: “Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony . . . .”

“Specific intent is not an element of the crime defined in [§ 53-21 (a) (1)]. . . . A general intent to do the proscribed act is required, however, as it is ordinarily for crimes of commission rather than omission.” (Citation omitted; internal quotation marks omitted.) *State* v. *Martin*, supra, 189 Conn. 12–13. Put another way, to support a conviction under § 53-21 (a) (1), the jury need

not "find any intent to injure the child or impair its health. All that [is] required [is] the general intent on the part of the defendant to perform the act which resulted in the injury, that is, that the bodily movement [that] resulted in the injury was volitional." (Emphasis omitted.) *State* v. *McClary*, 207 Conn. 233, 240, 541 A.2d 96 (1988).

"Accident is not a justification for a crime . . . it negates only one element of the crime, namely, intent. . . . A claim of accident, pursuant to which the defendant asserts that the state failed to prove the intent element of a criminal offense, does not require a separate jury instruction because the court's instruction on the intent required to commit the underlying crime is sufficient in such circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Moye*, 119 Conn. App. 143, 153–54, 986 A.2d 1134, cert. denied, 297 Conn. 907, 995 A.2d 638 (2010).

The defendant argues that pursuant to our Supreme Court's decision in *State v. Martin*, supra, 189 Conn. 1, the trial court erred in failing to adequately instruct the jury on accident. The defendant's case, however, is distinguishable from *Martin*, in which the facts were uniquely suited to an accident instruction. In *Martin*, the defendant testified that he injured a child when he fell and reflexively put his hands out to prevent his fall, thereby pushing the child against a nearby table. Id., 10–11. Specifically, the defendant in *Martin* stated that "someone grabbed him from behind. He spun around, his plastic kneecap locked and he fell . . . . He did not know whether he had touched [the child] as he fell . . . but he admitted that his reflex action in swinging out his arms to prevent his fall might have caused the child to be pushed against a table." Id., 11. Whereas the resulting injury in *Martin* was "wholly accidental" and reflexive, the injury in the present case was a result of the defendant intentionally holding V's head in his effort to suction mucous from her nose. The defendant in the present case maintains that he inadvertently used too much force in holding V's face, thereby accidentally causing the child's injuries. This, however, confuses an intentional act that causes an accidental outcome with a reflexive, involuntary act like that in *Martin*. Unlike in *Martin*, where the defendant placed his hands out as a reflexive reaction to external forces, in the present case, the defendant intentionally held his child's face.

Moreover, unlike in *Martin*, where the court entirely failed to mention accident in its charge, the court in the present case mentioned accident in its instruction on general intent. Our Supreme Court in *Martin* stated: "The failure of the court even to allude to this defense as one which the state had to disprove was a serious deficiency in the charge." Id., 13. Furthermore, our Supreme Court in *Martin* went on to state that "a curative instruction should have been given discussing the

general intent requirement in the context of the defense of accident which had been raised." Id., 14. In the present case, the court did more than allude to accident. In fact, it expressly mentioned accident in the context of the general intent requirement, stating: "[T]he state is required to prove that the defendant intentionally and not inadvertently or accidentally engaged in his actions." Although the court in the present case did not provide the jury with a separate accident charge, a separate charge was not required under the law. See *State* v. *Singleton,* 292 Conn. 734, 752, 974 A.2d, 679 (2009).

On the basis of the foregoing, we conclude that the court's charge was legally correct and adequately instructed the jury on the issue of accident.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of . . . a class C felony . . . ." Although § 53-21 had been amended in 2015, those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] J, who is a trained respiratory therapist, told the police that she took V to the hospital because she believed the child might have been suffering from encephalitis.

[3] Because we conclude that the charge was legally correct and affirm the decision on that basis, we do not address the state's argument that the court's failure to instruct the jury more fully on accident was harmless error.